FILED
ENTERED
RECEIVED
SERVED ON
COUNSEL/PARTIES OF RECORD
JUN 2 2 2026
CLERK US DISTRICT COURT
DISTRICT OF NEVADA
BY: DEPUTY

**Joshua Stacy**
5515 Michelli Crest Way
Las Vegas, NV 89149
(310) 773-2620
joshua.stacy@gmail.com
*Plaintiff, Pro Se*

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEVADA**

2:26-cv-01871-RFB-MDC

| | |
|---|---|
| JOSHUA STACY,<br>Plaintiff,<br><br>v.<br><br>JESSICA HUBBARD,<br>Defendant. | **Case No. [to be assigned by clerk]**<br><br>**COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Joshua Stacy, pro se, complains of Defendant Jessica Hubbard as follows.

## I. PRELIMINARY STATEMENT

1. **This case is about parental alienation, not arrears.** Defendant's continuing course of conduct uses Virginia child-support enforcement machinery as the instrument by which to sever the parent-child relationship between Plaintiff and the parties' medically fragile minor child A.S. The pattern is documented in writing: on December 9, 2022, Defendant — through counsel — offered to forgive Plaintiff's accrued child-support arrears in exchange for Plaintiff's surrender of his parental rights and cessation of his court filings. That offer states Defendant's purpose on the face of the record. Every act complained of in this Complaint is consistent with that purpose, and inconsistent with any lawful object of arrears collection.

1A. The Final Order of Divorce entered May 17, 2018 grants Plaintiff substantial visitation with A.S. — at a minimum four visits per week of four hours each. In application, Plaintiff cannot exercise any of that visitation. He cannot set foot in Virginia without exposing himself to arrest on the September 15, 2025 capias — an

arrest that would predictably follow given Defendant's documented object of severing the parent-child relationship and her demonstrated willingness to invoke the enforcement machinery the capias provides; he cannot pay the $25,000 cash-only purge demanded by that capias as the only condition on which the arrest leverage would be released; and Defendant has continuously denied telephonic and electronic contact with A.S. The visitation provisions of the FOD have, by Defendant's design, been rendered a dead letter. The decree on paper provides for four visits per week; the decree in operation permits no visits at all, until Plaintiff either surrenders his parental rights or pays the firm $25,000.

1B. **Plaintiff has at all times offered to pay; Defendant has structured her demand so that money alone cannot resolve it.** The dispute is not over Plaintiff's willingness to pay child support. Plaintiff's pre-suit settlement proposal (Ex. 7), tendered May 18, 2026 to Defendant's counsel Maria Simon and to Defendant Hubbard directly, offered (i) a one-time payment of $5,000 to fully resolve outstanding arrearages and clear the September 15, 2025 capias, and (ii) continuing child support of $300 per month for A.S. through her twenty-fifth birthday — a voluntary commitment extending Plaintiff's support obligation seven years beyond the underlying decree. Plaintiff asked for nothing in return except continued parental presence in A.S.'s life. Defendant did not respond — not within the five-day response window Plaintiff requested, and not in the twenty-three days that have elapsed since that window closed on May 21, 2026. That offer is not the position of an obstinate debtor; every dollar of the proposed amount flows to Defendant or to the support of A.S. The offer was preceded by years of Plaintiff's proposals to make ongoing support payments through ordinary channels. Defendant has rejected each such resolution. The two artifacts that bracket Defendant's true position are (i) the Surrender Letter (Ex. 1), which, on its face, conditions arrears forgiveness on Plaintiff's surrender of parental rights and cessation of court filings; and (ii) the capias (Ex. 3), which by its terms accepts only $25,000 in cash, payable to Defendant care of opposing counsel's firm, untethered to any present-ability-to-pay

finding. Together those documents reveal a demand whose only available exits are surrender of parental rights or payment of an unsatisfiable cash purge to a law firm. The structure of the demand reveals the object: this is not a collection effort; it is leverage against the parent-child relationship.

2. Plaintiff affirms the May 5, 2023 Final Order and Judgment Order entered in Fairfax County Circuit Court Case No. CL-2017-03555 as final. Plaintiff seeks no relief disturbing that judgment. The injuries pleaded here arise from Defendant's continuing course of conduct *after* that judgment became final on May 26, 2023 under Virginia Supreme Court Rule 1:1(a) — conduct conceived for ulterior purposes documented in writing, willfully aimed at Plaintiff's Nevada residence, and continuing through the date of this Complaint.

3. The acts complained of include: the December 9, 2022 surrender letter referenced above; a September 15, 2025 capias, sought by Defendant through counsel and issued in the Fairfax matter, conditioning Plaintiff's release upon a $25,000 cash-only payment to Defendant care of her counsel's firm; identifier-supply emails of August 20 and 21, 2025, sent by Defendant's counsel to chambers to facilitate execution of the capias against Plaintiff, including by interstate enforcement mechanisms should they be invoked; and continuing post-finality enforcement communications, chambers requests, and denials of court-ordered parent-child contact.

4. The Complaint pleads four causes of action under Nevada common law: (I) Abuse of Process; (II) Intentional Infliction of Emotional Distress; (III) Tortious Interference with Parental Rights, in the alternative; and (IV) Civil Conspiracy.

## II. PARTIES

5. Plaintiff Joshua Stacy is a natural person and a citizen of the State of Nevada, domiciled in Clark County, Nevada, since at least 2023.

6. Defendant Jessica Hubbard is a natural person and, on information and belief, a citizen of the Commonwealth of Virginia, residing in Fairfax County, Virginia.

7. The following non-parties are referenced in this Complaint as alleged co-conspirators of Defendant for purposes of Count IV but are not joined as defendants:

a. **Maria Simon**, a Virginia attorney and partner with The Geller Law Group, PLLC, who served as Defendant's counsel of record in the Fairfax matter at all times relevant to the post-finality conduct alleged herein and who authored the December 9, 2022 settlement letter on Defendant's behalf;

b. **The Geller Law Group, PLLC**, a Virginia professional limited liability company and Simon's employer; and

c. **Chandra Sheppard**, a Virginia attorney formerly with The Geller Law Group, PLLC, who served as Defendant's counsel during portions of the underlying proceeding and is alleged to have drafted orders adopted in the May 5, 2023 final writings.

## III. JURISDICTION AND VENUE

### A. Subject-matter jurisdiction.

8. This Court has subject-matter jurisdiction under 28 U.S.C. § 1332(a)(1). Plaintiff is a citizen of Nevada; Defendant is a citizen of Virginia. Complete diversity exists. The amount in controversy, exclusive of interest and costs, exceeds $75,000.

9. The domestic-relations exception to federal diversity jurisdiction is inapplicable. *Ankenbrandt v. Richards*, 504 U.S. 689, 703–04 (1992) ("the domestic relations exception . . . encompasses only cases involving the issuance of a divorce, alimony, or child custody decree"). *Marshall v. Marshall*, 547 U.S. 293, 308 (2006), confirms that subject-matter exceptions to diversity jurisdiction are narrow and do not bar tort claims merely because they touch a related family-law matrix. The Ninth Circuit follows the *Ankenbrandt* narrow reading. *Atwood v. Fort Peck Tribal Court Assiniboine & Sioux Tribes*, 513 F.3d 943, 947 (9th Cir. 2008) (the domestic-relations exception "applies only to the diversity jurisdiction statute") (citing *Ankenbrandt*, 504 U.S. at 703–04 (the exception is limited to "cases involving the issuance of a divorce, alimony, or child custody decree")). This Complaint

seeks tort damages alone — abuse of process, intentional infliction of emotional distress, tortious interference with parental rights (in the alternative), and civil conspiracy — and does not seek to issue, alter, modify, vacate, or interpret any decree.

9A. Plaintiff affirms, and seeks no review of, the May 5, 2023 final order entered in *Hubbard v. Stacy*, Case No. CL-2017-03555 (Fairfax Cir. Ct.). *Rooker-Feldman* therefore is not in issue. *Exxon Mobil Corp. v. Saudi Basic Indus. Corp.*, 544 U.S. 280, 284 (2005) (R-F is "confined to cases brought by state-court losers complaining of injuries caused by state-court judgments rendered before the district court proceedings commenced and inviting district court review and rejection of those judgments"); *Skinner v. Switzer*, 562 U.S. 521, 532 (2011) (reaffirming *Exxon Mobil* narrow formulation); *Noel v. Hall*, 341 F.3d 1148, 1164 (9th Cir. 2003) ("[i]f a federal plaintiff asserts as a legal wrong an allegedly illegal act or omission by an adverse party, *Rooker-Feldman* does not bar jurisdiction"). Plaintiff is not a state-court loser challenging the May 5, 2023 judgment; he affirms it as final and complains of Defendant's post-judgment tortious conduct.

**B. Personal jurisdiction.**

10. This Court has personal jurisdiction over Defendant under the Nevada long-arm statute, NRS 14.065, and the Due Process Clause of the Fourteenth Amendment, on the basis of Defendant's intentional acts expressly aimed at Nevada and causing harm Defendant knew was likely to be suffered in Nevada. *Calder v. Jones*, 465 U.S. 783 (1984); *Walden v. Fiore*, 571 U.S. 277, 284 (2014). The Ninth Circuit applies a three-prong "purposeful direction" test under *Calder*: the defendant must have "(1) committed an intentional act, (2) expressly aimed at the forum state, (3) causing harm that the defendant knows is likely to be suffered in the forum state." *Schwarzenegger v. Fred Martin Motor Co.*, 374 F.3d 797, 803 (9th Cir. 2004). Each prong is independently satisfied here.

11. Defendant's Nevada-directed conduct includes:

a. Pursuing, with knowledge.that Plaintiff resided in Las Vegas, Nevada, an August 15, 2025 finding that Plaintiff failed to appear for an in-person hearing — a finding predicated on Plaintiff's Nevada residence and the corresponding distance from the Virginia courthouse, made after Defendant's counsel opposed Plaintiff's request for remote appearance;

b. Causing the September 15, 2025 capias to issue against Plaintiff in his Nevada residence, which capias commanded Plaintiff's arrest and conditioned his release on a $25,000 cash-only payment to Defendant's counsel — a payment demand reaching directly into Plaintiff's Nevada-based financial resources;

c. Causing Defendant's counsel to supply chambers, on August 20 and 21, 2025, with personal identifiers (including Plaintiff's date of birth and, on information and belief, partial Social Security number) for the express purpose of facilitating execution of the capias against Plaintiff — identifiers that, in the ordinary course, equip interstate law-enforcement mechanisms to reach Plaintiff's Nevada residence should those mechanisms be invoked;

d. Causing post-finality chambers communications and enforcement filings to be served on Plaintiff at his Nevada residence;

e. Continuing, while Plaintiff was domiciled in Nevada, to deny telephonic and electronic contact between Plaintiff and the parties' minor child A.S., contrary to the visitation provisions of the Final Order of Divorce; and

f. Sustaining, while Plaintiff was domiciled in Nevada and operating a Nevada-based self-employed business, conduct that impairs Plaintiff's capacity to perform under existing engagements with Nevada-resident clients and to direct the work of Nevada-resident contractors who report to him — relationships of which Defendant has been aware at all relevant times, and the existence of which is reflected in Defendant's own sworn testimony in the underlying Fairfax proceeding, and on which Plaintiff's livelihood (including the support payments to Defendant described at paragraph 53(h)) depends. The capias's outstanding

status, the cash-only purge demand, and the deprivation of Plaintiff's ability to enter Virginia together project Defendant's coercive design into the Nevada-based commercial relationships that comprise Plaintiff's professional life.

12. The conduct described above is not merely conduct directed at a plaintiff who happens to reside in Nevada. It is conduct expressly aimed at Nevada — at causing arrest, financial extraction, and parent-child severance to occur within or against persons within the State of Nevada — and satisfies the *Walden v. Fiore* requirement that the defendant–forum link be established by the defendant's own forum-directed acts. 571 U.S. at 284 ("the defendant's suit-related conduct must create a substantial connection with the forum State").

12A. The structural fit is established by *Yahoo! Inc. v. La Ligue Contre Le Racisme et l'Antisemitisme*, 433 F.3d 1199, 1208–09 (9th Cir. 2006) (en banc), where the Ninth Circuit found purposeful direction satisfied because foreign defendants obtained foreign court orders directing actions in the forum state on threat of substantial penalty. The structural analogy is precise: Defendant Hubbard, through her counsel, obtained a Virginia state-court order — the September 15, 2025 capias — directing actions reaching into Nevada, including the prospect of arrest were Defendant to invoke the interstate-enforcement mechanisms the capias makes available against a Nevada resident, and the demand for payment of $25,000 from Nevada-based resources, on threat of substantial penalty (incarceration). *Yahoo!* expressly held that "[t]here is no requirement that the brunt of the harm be suffered in the forum"; jurisdictionally sufficient harm in the forum is enough. 433 F.3d at 1207.

12B. *Picot v. Weston*, 780 F.3d 1206, 1214 (9th Cir. 2015), and *Morrill v. Scott Financial Corp.*, 873 F.3d 1136, 1144–47 (9th Cir. 2017), are distinguishable. Both turned on out-of-forum litigation conduct that produced only foreseeable economic effects in the forum, not on conduct projecting coercive enforcement *into* the forum. Here Defendant did not merely litigate elsewhere with downstream consequences in Nevada; Defendant procured a state-court order whose machinery — including interstate rendition, NCIC entry, and extradition — is available, on its terms, to reach

into Nevada to seize a Nevada resident. The contact is the enforcement potential the order creates by its terms, sustained by Defendant's continuing maintenance of it; the harm follows from that enforcement potential and from Defendant's demonstrated object of denying Plaintiff access to A.S.

**C. Venue.**

13. Venue is proper in this District under 28 U.S.C. § 1391(b)(2) because a substantial part of the events and omissions giving rise to Plaintiff's claims occurred in this District: the effects of the capias, the financial demands, and the ongoing deprivation of contact with the parties' minor child were and are felt in this District, where Plaintiff resides.

**D. Timeliness — discovery rule and continuing tort.**

13A. Plaintiff's claims are timely under any plausible application of NRS 11.190(4)(e)'s two-year limitations period.

13B. **Discovery-rule theory.** Under Nevada law, "the statutory period of limitations is tolled until the injured party discovers or reasonably should have discovered facts supporting a cause of action." *Bemis v. Estate of Bemis*, 114 Nev. 1021, 1024–25, 967 P.2d 437, 440–41 (1998). The "willful act in the use of process not proper in the regular conduct of the proceeding" element of abuse of process — and the corresponding "extreme and outrageous" conduct supporting intentional infliction of emotional distress — was at the latest the September 15, 2025 capias and its continuing maintenance. That act occurred within two years of this Complaint's filing date. Each ongoing post-finality enforcement act, including the August 20–21, 2025 identifier-supply emails and Defendant's continuing maintenance of the outstanding capias, supplies an independently timely accrual point.

13C. **Continuing-tort theory (in the alternative).** Where a tort consists of a continuing course of conduct rather than a discrete completed wrong, the cause of action accrues — at minimum — anew with each continuing day of the same scheme. *Petersen v. Bruen*, 106 Nev. 271, 273–74, 792 P.2d 18, 19–20 (1990) (analogizing

accrual to false-imprisonment doctrine, "where each new day of confinement creates a new cause of action"); Restatement (Second) of Torts § 899 cmt. d. The Defendant's post-finality enforcement campaign — culminating in the September 15, 2025 capias and Defendant's continuing maintenance of it — is one such continuing course; each day the capias remains outstanding and the parent-child severance continues constitutes a new actionable instance.

## IV. FACTUAL BACKGROUND

**A. The underlying divorce and the May 5, 2023 final order.**

14. Plaintiff and Defendant were married and are the parents of one minor child, A.S., a minor identified by initials in accordance with Fed. R. Civ. P. 5.2(a)(3). A.S. is medically fragile and requires significant accommodations.

15. The parties' divorce litigation, captioned *Hubbard v. Stacy*, Case No. CL-2017-03555, was filed in the Fairfax County Circuit Court in 2017 and proceeded to a Final Order of Divorce entered on May 17, 2018, supplemented by a Memorandum Opinion on May 17, 2018 (collectively, the "FOD").

16. The FOD ordered, among other things, that the parties were mutually obligated to provide their tax returns to one another.

17. Following extended post-FOD proceedings concerning child support and contempt, on May 5, 2023, the Fairfax Court entered both an Order and a Judgment Order. Each writing stated, on its face, that "this matter is final."

18. Under Virginia Supreme Court Rule 1:1(a), the Fairfax Court's plenary jurisdiction over Case No. CL-2017-03555 expired twenty-one days later, on May 26, 2023.

19. Plaintiff affirms the May 5, 2023 writings as final. He does not in this action seek their disturbance, modification, vacatur, or interpretation.

**B. Defendant's documented ulterior purpose.**

***1. The December 9, 2022 surrender letter.***

20. On December 9, 2022 — five months before the May 5, 2023 final orders — Defendant's then-counsel, Maria Simon, sent Plaintiff a letter on Defendant's behalf (the "Surrender Letter"). A true and correct copy of the Surrender Letter is attached as Exhibit 1.

21. The Surrender Letter offered, in substance, that Defendant would forgive Plaintiff's accrued child-support arrears, on the conditions that Plaintiff (i) surrender his parental rights to A.S. in their entirety and (ii) cease filing further motions or pleadings in the Fairfax matter.

22. The Surrender Letter is direct documentary evidence of Defendant's ulterior purpose: namely, to extract concessions — parental surrender and litigation cessation — that bear no lawful relationship to the collection of child support.

***2. The April 25, 2023 trial admissions and the simultaneous strip-the-provision motion.***

23. On April 25, 2023, the Fairfax Court conducted a bench trial on the remaining post-FOD issues, transcribed at PP23A042 (the "Trial Transcript").

24. Defendant testified under oath. Among other things, Defendant testified, regarding her obligation under the FOD to exchange tax returns:

a. That, in an April 12, 2022 email admitted at trial as Defendant's Exhibit 11, she had written: "*When you are current on your support payments we can discuss other things like mutual shares and tax returns.*" [Trial Tr. p.145 ll.9–11.]

b. That her stated reason for withholding tax returns was: "*That you were behind on your support payments and I did not wish to be bothered with your demand that I hand over my tax returns.*" [Trial Tr. p.145 ll.13–15.]

c. In response to the express question, "Is it a part of the final order of divorce that we are both obligated to provide tax returns?" — Defendant answered: "*Yes, it is.*" [Trial Tr. p.145 ll.16–18.]

d. That she "did not provide them in a timely manner" and that "some of those tax returns were provided years late." [Trial Tr. p.145 l.23 -- p.146 l.1.] These admissions were corroborated at her subsequent deposition.

25. Contemporaneously with these sworn admissions, Defendant's counsel moved the Court to strip the mutual tax-return-exchange obligation from the FOD prospectively. [Trial Tr. p.218 ll.12–14.]

26. The Court granted that strip request in the May 5, 2023 Order at paragraph B.

27. The pattern is documented on the face of the Trial Transcript: while Defendant admitted on the stand that she had violated the FOD's tax-return obligation by withholding her returns and conditioning their production on Plaintiff's support payments, Defendant's counsel simultaneously moved to strip the violated obligation prospectively. The Court granted the strike. The pattern is direct evidence of Defendant's intent to use the Fairfax proceeding as an instrument for the elimination of obligations she had failed to honor — not as a forum for adjudication on the merits.

**C. The post-finality enforcement scheme (May 26, 2023 — present).**

28. Beginning shortly after the Fairfax Court's plenary jurisdiction expired on May 26, 2023, Defendant — through counsel — pursued a continuing campaign of post-finality enforcement activity in Case No. CL-2017-03555. This activity included rolling "review" hearings, repeated capias requests, and a series of orders entered without any new pleading or petition initiating a new proceeding.

29. Specific post-finality enforcement actions include, without limitation:

a. The October 31, 2024 order entered by Judge Christie Leary, 158 days after the Rule 1:1(a) jurisdictional cutoff;

b. The April 15, 2025 order entered by Judge Kaminsky;

c. The August 8, 2025 order entered by Judge Frieden, asserting "inherent authority" to continue the cause notwithstanding finality;

d. The August 15, 2025 order entered by Judge Saylor, which made a non-appearance finding and directed the issuance of a capias, and which was entered after Defendant's counsel opposed Plaintiff's request for remote appearance and without any finding that Plaintiff had a present ability to pay;

e. The August 20 and 21, 2025 emails from Defendant's counsel, Maria Simon, to chambers, supplying personal identifiers (including Plaintiff's date of birth and, on information and belief, partial Social Security number) for the purpose of facilitating execution of the capias; and

f. The September 15, 2025 capias, commanding Plaintiff's arrest "forthwith" and conditioning his release on a $25,000 cash-only purge payable to "The Geller Law Group, PLLC" — Defendant's counsel.

30. The September 15, 2025 capias has remained outstanding from its issuance through the date of this Complaint.

31. The capias was sought by Defendant, through counsel, with knowledge that Plaintiff resided in Las Vegas, Nevada. The capias was the means by which Defendant intended to (a) compel Plaintiff's physical entry into Virginia for arrest or (b) extract a $25,000 cash payment from Plaintiff's Nevada-based resources, paid into her counsel's trust account.

**D. The Nevada-directed character of Defendant's conduct.**

32. Defendant has known of Plaintiff's Nevada residence at all times relevant to this Complaint. Plaintiff's Nevada address has appeared in pleadings, orders, and correspondence in the Fairfax matter since at least May 2023.

33. Defendant has caused process and process-adjacent communications to be directed to Plaintiff at his Nevada residence at numerous points, including without limitation those described in paragraphs 29(a)–(f) above.

34. The September 15, 2025 capias is, by its terms and design, an instrument capable of crossing state lines: it commands the arrest of a person Defendant knew to be in Nevada, and the mechanisms by which it may be executed — interstate rendition processes, NCIC entry, and extradition — operate, when invoked, by reaching into Nevada.

35. The cash-only purge payment demanded by the capias — $25,000 payable to Defendant's counsel — is a demand on funds Plaintiff would necessarily have to mobilize from his Nevada-based finances, banked at Nevada institutions.

**E. Continuing injury — denial of contact with the minor child.**

36. The FOD provides for substantial visitation between Plaintiff and the parties' minor child A.S., including at a minimum four visits per week of four hours each.

37. For a sustained period of years, continuing through the date of this Complaint, Defendant has prevented Plaintiff from exercising his FOD-ordered visitation, including telephonic and electronic contact, while Plaintiff has been resident in Nevada.

38. The capias issued at Defendant's instance is the instrument by which much of the post-2025 deprivation has been effected: Plaintiff cannot enter Virginia to exercise visitation without exposing himself to arrest on the capias — an arrest that would predictably follow given Defendant's documented object and her demonstrated willingness to invoke the enforcement machinery the capias provides — and the capias's $25,000 cash-only purge is beyond his ability to satisfy.

39. A.S. is medically fragile. The deprivation of contact between Plaintiff and A.S. has caused, and continues to cause, severe and ongoing emotional distress to Plaintiff, and has caused harm to the parent-child relationship that Defendant intends to make permanent.

**F. Pre-suit demand.**

39A. On May 18, 2026, prior to filing this Complaint, Plaintiff transmitted a written settlement proposal addressed both to Defendant's counsel of record, Maria Simon, and to Defendant Hubbard personally at her direct email address. (Ex. 7.) The proposal offered: (i) a one-time payment of $5,000 to resolve outstanding arrearages and clear the September 15, 2025 capias; and (ii) continuing child support of $300 per month for A.S. until A.S. turns twenty-five — a voluntary commitment extending seven years beyond the support obligation the Final Order of Divorce imposes on Plaintiff. Plaintiff asked for nothing in return except continued parental presence in A.S.'s life. Plaintiff

requested a response by the end of the day on Thursday, May 21, 2026. As of the date of this Complaint — twenty-three days past the close of the requested response window — neither Defendant nor her counsel has responded to the proposal in any form. The proposal was tendered under Fed. R. Evid. 408 and Va. Code § 8.01-581.12, and is pleaded and offered solely to demonstrate Plaintiff's pre-suit good-faith effort at resolution and the complete absence of any response by Defendant, not to prove the validity or amount of any disputed claim or its compromise.

## V. CAUSES OF ACTION

### COUNT I — ABUSE OF PROCESS (Nevada common law)

40. Plaintiff incorporates paragraphs 1 through 39A as if fully set forth herein.

41. Under Nevada law, abuse of process consists of (i) an ulterior purpose by the defendant in connection with the use of legal process, and (ii) a willful act in the use of process not proper in the regular conduct of the proceeding. *Posadas v. City of Reno*, 109 Nev. 448, 457, 851 P.2d 438, 444–45 (1993); *LaMantia v. Redisi*, 118 Nev. 27, 30, 38 P.3d 877, 879 (2002); *Bull v. McCuskey*, 96 Nev. 706, 709, 615 P.2d 957, 960 (1980) ("malice and want of probable cause necessary to a claim of malicious prosecution are not essential to recovery for abuse of process"). The doctrine targets "the misuse of regularly issued process" for collateral object — distinguishing abuse of process, which attacks post-issuance misuse, from malicious prosecution, which targets wrongful issuance. *See Dutt v. Kremp*, 111 Nev. 567, 573–74, 894 P.2d 354, 358–59 (1995) (overruled on unrelated malicious-prosecution grounds by *LaMantia*).

41A. *LaMantia* is dispositive on Defendant's status as a proper defendant: the abuse-of-process defendant "does not necessarily need to be a named party in the underlying action" and liability attaches where the defendant "actively pressured or directed another to improperly use the legal process for an ulterior purpose." 118 Nev. at 30, 38 P.3d at 879–80. Defendant Hubbard, the named party in *Hubbard v. Stacy*, *a fortiori*

falls within *LaMantia*'s reach as the principal who directed the post-finality enforcement campaign through her counsel.

41B. The most recent published Nevada Supreme Court restatement of the doctrine confirms its post-judgment reach. *Land Baron Invs., Inc. v. Bonnie Springs Family LP*, 131 Nev. 686, 356 P.3d 511 (2015), reaffirms that "the mere filing of a complaint is insufficient to establish the tort of abuse of process. Instead, the complaining party must include some allegation of abusive measures taken after the filing of the complaint." This "post-filing abusive-measures" rule is structurally favorable to Plaintiff: the conduct attacked here is not Defendant's original 2017 divorce filing or her pre-finality litigation, but her post-finality enforcement campaign — paradigmatic post-filing abuse.

41C. Federal courts applying analogous abuse-of-process doctrine have held that a contempt arrest warrant deployed for a collateral object can constitute willful misuse of process. *See Hopper v. Drysdale*, 524 F. Supp. 1039 (D. Mont. 1981) (denying defendants' motion for summary judgment on abuse-of-process claim where defendants noticed and took plaintiff's civil deposition for the ulterior purpose of bringing him into the jurisdiction so that an outstanding contempt bench warrant could be executed against him; holding that "[a]n action for abuse of process arises when legal processes . . . are used against another to accomplish a purpose for which it is not designed"). Although *Hopper* is persuasive only, it is the cleanest published structural analogue to Plaintiff's theory: process-as-arrest-leverage to coerce something the moving party could not lawfully extract through the regular conduct of the proceeding.

42. Defendant acted with an ulterior purpose. The December 9, 2022 Surrender Letter (Ex. 1) is direct documentary evidence: Defendant offered to forgive arrears in exchange for parental surrender and cessation of court filings — purposes wholly extraneous to the lawful object of arrears collection.

43. Defendant's pattern of admit-on-the-stand-and-strip-by-motion at the April 25, 2023 trial, described in paragraphs 23 through 27, is further evidence of an ulterior purpose:

to use the Fairfax proceeding as an instrument for retroactive elimination of obligations Defendant had failed to honor.

43A. Defendant's response — or rather, the complete absence of any response — to Plaintiff's May 18, 2026 good-faith settlement proposal (Ex. 7) is itself direct evidence of ulterior purpose. By that proposal Plaintiff offered terms that, if Defendant's object had been the lawful collection of arrears and ongoing support, would have resolved the dollar dispute in full: a one-time $5,000 payment to clear arrears and the September 15, 2025 capias, together with continuing monthly support of $300 voluntarily extended seven years beyond Plaintiff's obligation under the underlying decree. Plaintiff asked for nothing in return except continued parental presence in A.S.'s life. Twenty-three days have elapsed beyond Plaintiff's requested response window with no response from Defendant or her counsel of any kind. A party whose object were the collection of money would, at minimum, respond to a generous good-faith offer that exceeds the existing support obligation — to negotiate, to counter, to accept, to decline. Defendant's complete silence in the face of such an offer, while continuing to maintain the $25,000 capias as the only avenue she will entertain, is the conduct of a party whose object is not the collection of money but the coercion of something money cannot lawfully buy.

44. Defendant willfully used legal process not proper in the regular conduct of the proceeding. After the Fairfax Court's plenary jurisdiction expired on May 26, 2023, Defendant — through counsel — caused the issuance of, *inter alia*: post-finality "review" orders without supporting new pleadings; an August 15, 2025 non-appearance finding without an ability-to-pay determination; and the September 15, 2025 capias with a $25,000 cash-only purge payable to Defendant's counsel.

45. The September 15, 2025 capias is itself an act of willful misuse of process. It was sought as a means of (i) coercing Plaintiff into surrendering his parental rights or otherwise abandoning contact with A.S. while resident in Nevada and beyond the practical reach of

routine Virginia process, and (ii) extracting a $25,000 payment to Defendant's counsel as a condition of avoiding arrest, untethered to any present-ability-to-pay finding.

46. Each post-finality enforcement act described in paragraphs 28 through 31 constitutes a discrete willful misuse of process and is independently actionable under this Count.

46A. **Litigation privilege does not insulate Defendant.** The Nevada Supreme Court has held that the litigation privilege has limits — it does not categorically shield tort claims arising from misuse of process for purposes other than obtaining relief in the underlying lawsuit. *See, e.g., Greenberg Traurig, LLP v. Frias Holding Co.*, 130 Nev. 627, 331 P.3d 901 (2014) (litigation privilege does not bar legal-malpractice claims by client; recognizing the privilege as non-absolute). Plaintiff's allegations are precisely that Defendant pursued post-finality enforcement to extract collateral concessions (parental surrender; litigation cessation; cash to opposing counsel's firm), not to obtain lawful relief in *Hubbard v. Stacy*, the merits of which had become final no later than May 26, 2023.

47. Defendant's conduct has caused Plaintiff actual damages including, without limitation, attorneys' fees and costs in defense of post-finality proceedings, lost income from inability to travel to Virginia, expenses incurred in connection with the capias, and severe emotional distress.

48. Defendant's conduct was malicious, oppressive, and undertaken with conscious disregard for Plaintiff's rights, warranting punitive damages.

**COUNT II — INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS**

**(Nevada common law)**

49. Plaintiff incorporates paragraphs 1 through 39A as if fully set forth herein.

50. Under Nevada law, intentional infliction of emotional distress requires (i) extreme and outrageous conduct, (ii) intent or reckless disregard of causing emotional distress, (iii) plaintiff's severe or extreme emotional distress, and (iv) actual and proximate causation. *Star*

*v. Rabello*, 97 Nev. 124, 125, 625 P.2d 90, 91–92 (1981); *Olivero v. Lowe*, 116 Nev. 395, 398–99, 995 P.2d 1023, 1025–26 (2000). The conduct must be "outside all possible bounds of decency" and "utterly intolerable in a civilized community." *Star*, 97 Nev. at 125, 625 P.2d at 91–92. Whether the conduct meets that threshold is an inquiry committed to the jury, considering "the prevailing circumstances, contemporary attitudes and the plaintiff's own susceptibility." *Branda v. Sanford*, 97 Nev. 643, 649, 637 P.2d 1223, 1227 (1981).

50A. **Count II is parasitic on Count I.** Plaintiff's IIED claim arises from the same factual matrix as the abuse-of-process claim pleaded in Count I. The independent tortious conduct supporting Count I — Defendant's documented ulterior purpose plus her willful post-finality misuse of state-court enforcement machinery — is the same conduct that constitutes the extreme-and-outrageous element of Count II. The claim is not free-standing emotional-distress alleging from ordinary litigation friction; it is parasitic on independently actionable abuse of process.

50B. Nevada has sustained substantial IIED verdicts where a defendant with structural leverage over the plaintiff converts that leverage into a sustained, binary demand. *See Dillard Dep't Stores, Inc. v. Beckwith*, 115 Nev. 372, 989 P.2d 882 (1999) (affirming $200,000 IIED jury verdict where employer, after plaintiff's workplace injury and workers'-compensation claim, refused to restore her to either of two open positions for which she was qualified, demanded that she accept demotion to entry-level work with a 40% pay cut or resign, and ignored her ensuing complaints of workplace humiliation and health deterioration). The structural parallel illustrates the principle. In *Beckwith*, the leverage was employer/employee; here, post-finality state-court enforcement leverage — a $25,000 cash-only purge payable to opposing counsel's firm or arrest, untethered to any present-ability-to-pay finding, deployed against an out-of-state parent with a medically fragile child.

51. Defendant's conduct, taken as a whole, is extreme and outrageous. Defendant has used the apparatus of state-court enforcement — over a period exceeding three years — for

the documented purpose of breaking the parent-child bond between Plaintiff and the parties' medically fragile minor child. Defendant has done so:

a. By offering, in writing, to forgive arrears in exchange for Plaintiff's surrender of his parental rights and cessation of court filings (Ex. 1);

b. By admitting on the stand to violating the very FOD provision under which she purported to seek enforcement, while moving simultaneously to strip the violated provision prospectively;

c. By pursuing a capias commanding Plaintiff's arrest, conditioned on a $25,000 cash-only payment to her counsel, while knowing Plaintiff lived 2,000 miles away in Nevada and could not access the parties' child without crossing into the jurisdiction in which he would face arrest at Defendant's option; and

d. By denying telephonic and electronic contact between Plaintiff and the parties' medically fragile child throughout the pendency of the capias.

52. Defendant intended to cause Plaintiff severe emotional distress, or acted with reckless disregard of the substantial certainty that her conduct would do so.

53. Plaintiff has suffered, and continues to suffer, severe and disabling emotional distress as a direct and proximate result of Defendant's conduct. The distress is sustained, intrusive, and embodied. Plaintiff has carried it, daily, for more than three years, without remission and without lawful resolution available on terms Defendant will entertain. It manifests in ways that include, without limitation, the following:

a. Recurrent sleep disturbance, including intrusive dreams of contact with A.S., from which Plaintiff routinely wakes in tears and is unable to return to sleep;

b. Recurrent episodes of involuntary weeping during ordinary work and family hours, often triggered by the recognition that another day has passed without contact with A.S.;

c. A persistent, embodied sense of bereavement-while-alive — the loss of a living child to whom Plaintiff is barred from speaking, holding, or seeing — for which

Plaintiff is without adequate language, and which he experiences as the sensation of a part of himself having been removed;

d. Pervasive anxiety anchored to the knowledge that A.S. is medically fragile and that Plaintiff may never see his daughter alive again because Defendant has structured her demands so that the only available paths to contact are surrender of Plaintiff's parental rights or payment of a $25,000 cash purge Plaintiff cannot satisfy;

e. Material strain on Plaintiff's marital relationship with his current spouse, caused by the duration, intensity, and intrusiveness of the distress Plaintiff carries from Defendant's conduct;

f. Material impairment of Plaintiff's ability to concentrate on, and perform, the work by which he supports himself and his family — work that includes, as Defendant has known at all relevant times, the very earnings from which Plaintiff has continued to make support payments to Defendant for the benefit of A.S. The impairment extends beyond Plaintiff personally: as a self-employed business operator based in Nevada, Plaintiff carries ongoing obligations to Nevada-resident clients who depend on his work and to Nevada-resident contractors who depend on his direction and on his ability to pay them. Defendant's sustained interference compounds Plaintiff's distress by imposing derivative harm on those Nevada-based relationships — relationships that, as Defendant has known, are the structural foundation on which Plaintiff's voluntary support of A.S. is built;

g. Pervasive geographic modulation: the outstanding capias requires Plaintiff to modulate the conduct of his daily life around the predictable risk that crossing into Virginia at any time, for any purpose — including a family wedding, a funeral, or any other ordinary occasion — would result in his arrest, given Defendant's documented object of severing the parent-child relationship and the corresponding likelihood that Defendant would alert Fairfax law enforcement to Plaintiff's presence in the jurisdiction; the deprivation accordingly extends

beyond visits with A.S. to encompass the broader Virginia familial and social life Plaintiff was entitled to maintain before Defendant's conduct;

h. Compounding moral injury: each manifestation above is intensified by the fact that Plaintiff has at all relevant times paid child support, and has done so by voluntarily structuring his earnings to pass through wage withholding even though, as a self-employed individual, he is not subject to involuntary garnishment under ordinary process — so that support flows to Defendant on the first dollar of Plaintiff's earnings, automatically, and beyond what any court has ordered. Defendant has nonetheless used the financial picture into which Plaintiff's voluntary withholding flows as the lever by which she has continued to deprive Plaintiff of contact with A.S.; and

i. Engineered hopelessness: Defendant's design — surrender parental rights or pay an unsatisfiable cash purge — eliminates every middle path Plaintiff might lawfully take, producing the particular distress of facing a closed door whose closure was authored not by misfortune but by deliberate choice.

53A. Plaintiff's distress is qualitatively heightened, and the *Star* "severe or extreme" threshold independently satisfied, by the medical condition of A.S. A.S. survived three separate brain surgeries before the age of two; her treating physicians did not expect her to reach the age of three; she is, by what Plaintiff regards as a miracle, alive and now eleven years old, and remains medically fragile. Plaintiff has been deprived by Defendant's conduct of all but a handful of in-person visits, and less than one minute of cumulative video contact in the last year, with A.S. over a period of years. The conjunction of A.S.'s known medical fragility and Defendant's calculated, sustained, post-finality course of conduct converts ordinary parental-separation distress into a sustained anticipation of irreversible loss — the prospect that Plaintiff's last meaningful contact with his daughter may already have occurred, by Defendant's design.

53B. Plaintiff's distress is further heightened by a particular religious vulnerability of which Defendant has personal knowledge. Plaintiff and Defendant were married in the Palmyra New York Temple of The Church of Jesus Christ of Latter-day Saints, where they together entered into the religious ordinance commonly known as the temple sealing — a covenant whose central religious object is the perpetual continuation of the family relationship and, in particular, the parent-child relationship. Defendant was a party to that covenant. Defendant has at all relevant times been aware of Plaintiff's continuing religious commitment to the covenant and to its parent-child object. The conduct pleaded in this Count — directed at the surrender of Plaintiff's parental rights and the severance of the parent-child relationship with A.S. — therefore targets not only the lawful and constitutional parent-child relationship but the religious construction of family Defendant once joined Plaintiff in entering. Defendant's known willingness to engineer the destruction of what she once covenanted with Plaintiff to preserve, and her knowledge of Plaintiff's enduring commitment to that covenant, are factors under *Branda v. Sanford*, 97 Nev. 643, 649, 637 P.2d 1223, 1227 (1981) ("the prevailing circumstances, contemporary attitudes and the plaintiff's own susceptibility"), that the trier of fact may consider in determining the severity of the resulting distress.

53C. The continuing-tort and discovery-rule timeliness analyses set out in paragraphs 13A–13C apply equally here: each post-finality enforcement act, and each day of capias-driven separation from A.S., is an additional and independent infliction, and in any event, the September 15, 2025 capias and Defendant's continuing maintenance of it are themselves within the two-year limitations period.

53D. **Litigation privilege does not insulate Count II.** As set forth in paragraph 46A and incorporated here, the litigation privilege under Nevada law does not categorically shield tort claims arising out of conduct directed at collateral objects rather than at obtaining relief in the underlying proceeding. *Greenberg Traurig, LLP v. Frias Holding Co.*, 130 Nev. 627, 331 P.3d 901 (2014).

54. Defendant's conduct was malicious, oppressive, and undertaken with conscious disregard for Plaintiff's rights, warranting punitive damages.

**COUNT III — TORTIOUS INTERFERENCE WITH PARENTAL RIGHTS (Nevada common law, in the alternative)**

55. Plaintiff incorporates paragraphs 1 through 39A as if fully set forth herein.

56. Plaintiff pleads this Count in the alternative, recognizing that the Nevada Supreme Court has not yet addressed whether the common-law tort of intentional interference with parental rights is cognizable under Nevada law. Plaintiff invokes the substantial body of state-high-court authority recognizing the tort, grounded in **Restatement (Second) of Torts § 700**, as the rule the Nevada Supreme Court should adopt. The recognizing camp is, as the Virginia Supreme Court characterized it in *Wyatt v. McDermott*, "the overwhelming majority" of state high courts that have addressed the question.

56A. State high-court adoptions of the tort under Restatement § 700 include, without limitation:

- *Plante v. Engel*, 124 N.H. 213, 469 A.2d 1299 (1983) (recognizing the tort; damages include expenses of recovery and loss of the child's care, comfort and companionship);
- *Wood v. Wood*, 338 N.W.2d 123 (Iowa 1983) (reciting Restatement § 700 and articulating four-element test);
- *Silcott v. Oglesby*, 721 S.W.2d 290 (Tex. 1986) (recognizing common-law cause of action; restoring $100,000 jury verdict);
- *Kessel v. Leavitt*, 204 W. Va. 95, 511 S.E.2d 720 (1998) (affirming substantial compensatory and punitive verdict on tortious-interference-with-parental-rights and related claims; Restatement § 700 framework);
- *Stone v. Wall*, 734 So. 2d 1038 (Fla. 1999) (modern Restatement-influenced state-supreme-court adoption; damages "based on the sanctity of the parent-child relationship");
- *Khalifa v. Shannon*, 404 Md. 107, 945 A.2d 1244 (2008) (Maryland Court of Appeals affirming jury verdict; standard requires conduct that is "intentional, outrageous, [and]

involve[s] the physical removal and harboring of the child from the parent" or analogous interference);

- *Wyatt v. McDermott*, 283 Va. 685, 725 S.E.2d 555 (2012) (recognizing tort; articulating four elements grounded in Restatement § 700 and in the constitutional protection of the parent-child relationship).

56B. Plaintiff candidly discloses *Larson v. Dunn*, 460 N.W.2d 39 (Minn. 1990), as the principal high-court authority **declining** to recognize the tort, on the rationale that "the law should not provide a means of escalating intrafamily warfare." Minnesota's concern is inapposite here. The harm pleaded is not a custody-modification proxy or garden-variety intrafamily friction. It is the misuse of post-finality state-court enforcement machinery — a Sept. 15, 2025 capias plus a documented Dec. 9, 2022 demand to surrender parental rights — to coerce extinguishment of a parent-child relationship after the underlying decree had become final. *Larson*'s rationale targets the use of tort law as a custody-litigation weapon; nothing in *Larson* counsels against recognizing the tort where, as here, the conduct attacked is the weaponization of state-court process *after* finality, for purposes wholly unrelated to the merits adjudicated in the divorce.

57. The FOD vests in Plaintiff substantial visitation rights with the parties' minor child A.S., including no fewer than four visits per week of four hours each.

58. Defendant has, through her conduct described in paragraphs 28 through 39 above — including her instigation of the September 15, 2025 capias and her continuous denial of telephonic and electronic contact — interfered with Plaintiff's exercise of those rights.

59. Defendant's interference is intentional and is directed at the object of severing the parent-child relationship between Plaintiff and A.S.

60. As a result, Plaintiff has been deprived of his parental rights and has suffered loss of consortium with his child, severe emotional distress, and continuing injury to the parent-child relationship.

**COUNT IV — CIVIL CONSPIRACY (Nevada common law)**

61. Plaintiff incorporates paragraphs 1 through 39A as if fully set forth herein.

62. Under Nevada law, civil conspiracy consists of a combination of two or more persons who, by some concerted action, intend to accomplish an unlawful objective for the purpose of harming another, with resulting damages. *Hilton Hotels Corp. v. Butch Lewis Productions, Inc.*, 109 Nev. 1043, 1048, 862 P.2d 1207, 1210 (1993). The agreement element may be "explicit or tacit"; "the sine qua non of a conspiratorial agreement is the knowledge on the part of the alleged conspirators of its unlawful objective and their intent to aid in achieving that objective." *Collins v. Union Federal Sav. & Loan Ass'n*, 99 Nev. 284, 303, 662 P.2d 610, 622 (1983); *accord GES, Inc. v. Corbitt*, 117 Nev. 265, 270–71, 21 P.3d 11, 15 (2001) (modern lead Nevada formulation; tacit-or-explicit agreement sufficient); *Jordan v. State, Department of Motor Vehicles*, 121 Nev. 44, 110 P.3d 30 (2005) (reaffirming explicit-or-tacit agreement standard).

62A. Nevada civil conspiracy requires both an agreement (explicit or tacit) and an underlying unlawful or tortious objective; agreement alone is insufficient. *GES, Inc. v. Corbitt*, 117 Nev. 265, 270–71, 21 P.3d 11, 15 (2001); *Dow Chem. Co. v. Mahlum*, 114 Nev. 1468, 970 P.2d 98, 112 (1998). Plaintiff has pleaded tortious objectives in Counts I, II, and III, satisfying that requirement. The agreement here is, as Nevada law expressly recognizes, **tacit and circumstantial** — there is no smoking-gun communication memorializing the conspiracy; the agreement is inferred from the coordinated post-finality conduct described in paragraphs 28 through 39, including the joint procurement of post-finality "review" orders, the identifier-supply emails of August 20–21, 2025, and the September 15, 2025 capias's structure (cash-only purge payable to opposing counsel's firm).

62B. The Nevada Supreme Court's modern formulation of the elements is consistent: an agreement directed to an unlawful or tortious objective will support a civil-conspiracy claim where it accompanies a properly pleaded underlying tort. *Consolidated Generator-Nevada, Inc. v. Cummins Engine Co.*, 114 Nev. 1304, 1311, 971 P.2d 1251, 1256 (1998); *see also Spirtos v. Yemenidjian*, 137 Nev. Adv. Op. 73,

499 P.3d 611 (2021) (affirming denial of anti-SLAPP motion to dismiss in tort action alleging slander and civil conspiracy together). Plaintiff's Count IV is in that posture: pleaded together with actionable Counts I (AOP), II (IIED), and III (TIPR, in the alternative).

63. Defendant combined with non-parties Maria Simon, The Geller Law Group, PLLC, and Chandra Sheppard to accomplish the unlawful objective set forth in Count I — namely, the misuse of post-finality state-court enforcement process for the ulterior purposes of parental surrender and litigation cessation, as documented in the December 9, 2022 Surrender Letter and effectuated by the conduct described in paragraphs 28 through 39.

64. Concerted overt acts include, without limitation:

a. The drafting and transmittal of the December 9, 2022 Surrender Letter (Simon, on behalf of Defendant);

b. The drafting of orders later adopted verbatim by the Fairfax Court (Simon and Sheppard);

c. The joint pursuit of post-finality "review" hearings and orders without supporting new pleadings;

d. The transmission to chambers, on August 20 and 21, 2025, of identifiers (date of birth and, on information and belief, partial Social Security number) for purposes of facilitating execution of the September 15, 2025 capias (Simon); and

e. The September 15, 2025 capias issuance, sought jointly by Defendant and her counsel.

65. The conduct of Simon, GLG, and Sheppard described above exceeded the ordinary scope of legal representation and constituted independent participation in the unlawful objective. The intracorporate-conspiracy doctrine, *Cadle Co. v. Woods & Erickson, LLP*, 131 Nev. 114, 345 P.3d 1049 (2015), does not insulate this conduct from conspiracy liability. *Collins* expressly limits intracorporate immunity to agents acting "in their official capacity on behalf of the corporation **not as individuals for their individual advantage**." 99

Nev. at 303, 662 P.2d at 622 (emphasis added). Two facts pleaded above place Simon, GLG, and Sheppard outside that immunity:

a. **Individual advantage.** The September 15, 2025 capias conditioned Plaintiff's release on a $25,000 cash purge payable directly to Defendant care of The Geller Law Group, PLLC's offices — i.e., flowing through the firm's trust mechanism. The cash demand is a financial benefit accruing to GLG (and to Simon as its partner) qua firm, distinct from any benefit to Defendant alone. That financial interest is "individual advantage" within *Collins*'s textual carve-out.

b. **Outside ordinary scope of representation.** The Fairfax Court's plenary jurisdiction over Case No. CL-2017-03555 expired on May 26, 2023 under Va. Sup. Ct. R. 1:1(a). Continued enforcement filings, identifier-supply emails to chambers, and capias-procurement after that date were outside the ordinary scope of legitimate representation in a final domestic-relations matter. *Cadle*'s assumption — that attorneys act within their representational capacity — does not hold where the alleged conduct is the very conduct that exceeds that capacity.

65A. Plaintiff alleges further that the unlawful objective was tortious (abuse of process), not economic, and that the conspirators' agreement was tacit and circumstantial — both expressly recognized as sufficient under *Collins* and *Hilton Hotels*.

66. Defendant and the non-party co-conspirators acted with the purpose of harming Plaintiff, and Plaintiff has been damaged thereby.

67. Defendant's conduct was malicious, oppressive, and undertaken with conscious disregard for Plaintiff's rights, warranting punitive damages.

## VI. PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment against Defendant as follows:

A. Compensatory damages in an amount to be proven at trial, but in any event in excess of $75,000;

B. Punitive damages in an amount sufficient to deter Defendant and others similarly situated;

C. Costs of suit, and attorneys' fees as may be permitted by law;

D. Pre- and post-judgment interest at the maximum rate permitted by law; and

E. Such other and further relief as the Court deems just and proper.

## VII. JURY DEMAND

Plaintiff demands trial by jury on all issues so triable.

Respectfully submitted,

Joshua Stacy
Plaintiff, Pro Se
5515 Michelli Crest Way
Las Vegas, NV 89149
(310) 773-2620
joshua.stacy@gmail.com
Dated: June 22, 2026

**Joshua Stacy**
5515 Michelli Crest Way
Las Vegas, NV 89149
(310) 773-2620
joshua.stacy@gmail.com
*Plaintiff, Pro Se*

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEVADA**

| | |
|---|---|
| JOSHUA STACY,<br>Plaintiff,<br><br>v.<br><br>JESSICA HUBBARD,<br>Defendant. | **Case No. [to be assigned by clerk]**<br><br>**CERTIFICATE OF INTERESTED PARTIES (LR 7.1-1)** |

The undersigned, appearing pro se, hereby certifies that the following persons, associations of persons, firms, partnerships, or corporations have a direct, pecuniary interest in the outcome of this case, in compliance with Local Rule 7.1-1:

1. **Joshua Stacy** — Plaintiff. Natural person, citizen of Nevada.
2. **Jessica Hubbard** — Defendant. Natural person, citizen of Virginia.
3. **A.S. (minor child)** — The parties' minor child. Not a party. Identified by initials in accordance with Federal Rule of Civil Procedure 5.2(a)(3). The minor child has an interest in the parent-child relationship at issue in this action; the minor child does not have a direct pecuniary interest in the outcome.

The following persons are referenced in the Complaint as non-party co-conspirators with respect to Count IV (Civil Conspiracy) but are not named as defendants and are not parties to this action:

1. **Maria Simon**, attorney, partner of The Geller Law Group, PLLC.
2. **The Geller Law Group, PLLC**, a Virginia professional limited liability company.
3. **Chandra Sheppard**, attorney, formerly of The Geller Law Group, PLLC.

These representations are made to enable Judges of the Court to evaluate possible disqualification or recusal.

Respectfully submitted,

Joshua Stacy
Plaintiff, Pro Se
5515 Michelli Crest Way
Las Vegas, NV 89149
(310) 773-2620
joshua.stacy@gmail.com
Dated: June 22, 2026